UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

RYAN GOODWIN,

    *Plaintiff,*

    *v.*

ADVANCED CORRECTIONAL HEALTHCARE, INC.,
USA MEDICAL & PSYCHOLOGICAL STAFFING, S.C.,
AND IRIS TORRES,                Case No: 1:24-cv-562

    *Defendants.*

---

## COMPLAINT

---

Plaintiff Ryan Goodwin, by his attorneys, Strang Bradley, LLC, for his complaint against Defendants, state:

### INTRODUCTION

1.      On August 31, 2022, Ryan Goodwin was booked into the Kewaunee County Jail. Mr. Goodwin had been at the Kewaunee County Jail before, and the jailers knew that he suffered from epilepsy and that he needed to take anti-seizure medication. When Mr. Goodwin was booked into the jail, he also reminded the jail staff that he was epileptic and needed to take his anti-seizure medication. Despite the jail staff knowing that Mr. Goodwin needed his anti-seizure medication, and that Mr. Goodwin's anti-seizure medication was brought to the jail the same day he was booked in, no one at the jail gave Mr. Goodwin his prescription anti-seizure medication causing him to suffer a breakthrough seizure.

1

2.      This is another example of a human being taken into custody in a Wisconsin jail with a serious medical condition that requires them to continue to regularly take their prescription medication to avoid a catastrophic or potentially deadly event, and despite the fact that the person informs the jail staff of their serious medical condition and the need to continue taking their prescription medication and the fact the jail has their prescription medication in their possession, the jail staff and medical staff refuse to provide the individual with their necessary prescription medication, causing the person to needlessly suffer a catastrophic or potentially deadly medical event.

3.      This is another example of counties in Wisconsin deciding to contract out their responsibilities to provide healthcare to inmates taken into custody in their jails, by hiring the lowest cost provider and prioritizing balancing their budgets over fulfilling their constitutional obligations to provide the most basic healthcare to those forced into their jail. These private for-profit healthcare providers are able to provide the lowest cost healthcare for the jails at the same time making profits at the expense of the health and lives of people who are detained in jails by denying the inmates medication, ignoring their medical needs and delaying or refusing to provide basic medical care.

4.      This lawsuit seeks to vindicate the violation of Plaintiff's constitutional rights. It seeks to effect change through punitive damages by punishing the Defendants for their egregious conduct with the hope that the punishment is significant enough to prevent this from happening again in the future.

## JURISDICTION AND VENUE

5.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

6.      This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and the state law indemnification claim pursuant to 28 U.S.C. § 1367.

7.      Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

8.      Plaintiff Ryan Goodwin is a resident of the State of Wisconsin and the County of Kewaunee.

9.      Defendant Advanced Correctional Healthcare, Inc. ("ACH") is a foreign for-profit corporation incorporated under the laws of the State of Illinois, doing business in the State of Wisconsin. ACH's principal office is located at 720 Cool Springs Blvd., Suite 100, Franklin, TN 37067, and its Registered Agent is C T Corporation System, 301 S. Bedford Street, Suite 1, Madison, WI 53703. As is relevant herein, ACH is a "person" for purposes of 42 U.S.C. § 1983. ACH's acts and omissions in relation to the Kewaunee County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. ACH is legally liable for all its policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Kewaunee County Jail or elsewhere.

10.      Defendant USA Medical & Psychological Staffing, S.C. ("USA Medical") is a foreign for-profit corporation incorporated under the laws of the State of Illinois, doing

business in the State of Wisconsin. ACH's principal office is located at 720 Cool Springs Blvd., Suite 100, Franklin, TN 37067, and its Registered Agent is C T Corporation System, 301 S. Bedford Street, Suite 1, Madison, WI 53703. As is relevant herein, USA Medical is a "person" for purposes of 42 U.S.C. § 1983. USA Medical's acts and omissions in relation to the Kewaunee County Jail, including the acts and omissions of its employees and agents, were conducted under color of state law. USA Medical is legally liable for all its policies and practices referenced herein and for the acts and omissions of its employees, agents, and independent contractors, whether located at the Kewaunee County Jail or elsewhere.

11.     Defendant Iris Torres was at the time of this occurrence employed as a doctor in the Kewaunee County Jail. Torres was employed at the Kewaunee County Jail as a contractor through ACH. In that role, she was responsible for the health and welfare of detainees confined in the jail, including Ryan Goodwin. Torres engaged in the conduct complained of while she was on duty and in the course and scope of her employment at the Kewaunee County Jail through ACH.

**FACTS**

12.     On August 31, 2022, Mr. Goodwin was booked into the Kewaunee County Jail.

13.     On August 31, 2022, Mr. Goodwin's intake screening was completed by officer John Dubois. Dubois noted on the intake form that Mr. Goodwin suffers from epilepsy, that he was currently under a doctor's care for his epilepsy, and that two weeks ago he had three seizures. Dubois also noted that Mr. Goodwin was currently taking the following prescription medication: Divalproex and Lamotrigine. Additionally, Dubois

noted that Mr. Goodwin had his prescription medication Divalproex and Lamotrigine with him at the time of booking.

14.     On August 31, 2022, a medication verification form for Mr. Goodwin was filled out indicating that he brought with him to the jail 27 Lamotrigine pills and 84 Divalproex pills.

15.     Mr. Goodwin's medication verification form was filled out at 8:30am on August 31, 2022.

16.     On August 31, 2021, around 8:30am, Correctional Officer Logan Hermans called Defendant Torres and told her that he had confirmed Mr. Goodwin's prescription for Lamotrigine and Divalproex with Mr. Goodwin's pharmacy and asked whether he should emergency order Mr. Goodwin's anti-seizure medication so that he could immediately pick it up from a local pharmacy.

17.     Defendant Torres knew that Goodwin had epilepsy and that he needed his antiseizure medication to prevent him from having seizures.

18.     Defendant Torres issued verbal medication orders to Hermans that he did not need to emergency order Mr. Goodwin's anti-seizure medication, and that a nurse would take care of placing a standard mail order for Mr. Goodwin's medication when she came to the jail for her next shift.

19.     On August 31, 2022, Mr. Goodwin did not receive his PM dose of either Lamotrigine or Divalproex.

20.     The following day on September 1, 2022, nurse Stacy Bosdeck wrote on Goodwin's intake form that she reviewed it and signed her name.

21.    Mr. Goodwin did not receive his AM dose of Divalproex on September 1, 2022.

22.    Hailee Jandrin conducted the AM medication pass at the Kewaunee County Jail on September 2, 2022, but she failed to give Mr. Goodwin his Divalproex medication.

23.    Erin Tuttle conducted the PM medication pass at the Kewaunee County Jail on September 2, 2022, and she filled out Mr. Goodwin's Medication Administration Record indicating that she did not give Mr. Goodwin his Lamotrigine or Divalproex medication because they were "out of stock."

24.    Logan Hermans conducted the AM medication pass at the Kewaunee County Jail on September 3, 2022, but he failed to give Mr. Goodwin his Divalproex medication.

25.    Torres, ACH, and Kewaunee County all knew that it was illegal for a provider to issue verbal medication orders to a non-medically licensed correctional officer, but they all ignored this legal requirement because it was profitable for ACH and saved Kewaunee County money to do so.

26.    Wisconsin law does not permit non-medically licensed correctional officers to accept verbal or telephone medication orders because doing so presents a safety concern for the patient.

27.    Defendant Torres knew that Mr. Goodwin was epileptic and that he needed to take his prescription medication each day to prevent seizures.

28.    Defendant Torres knew that her refusal to instruct the jail staff to emergency order Mr. Goodwin's Divalproex or Lamotrigine to prevent seizures and her failure to

provide any substitute medication or treatment for his epilepsy would put Mr. Goodwin at a substantial risk of having a seizure.

29.     Mr. Goodwin repeatedly requested to be given his anti-seizure medication.

30.     The Kewaunee County Jail staff and ACH staff ignored Mr. Goodwin's calls for help.

31.     On September 1, 2022, nurse Bosdeck wrote a progress note saying that she met with Mr. Goodwin and he was "very upset due to the fact that he is not able to get his prescription medication that he brought from home" and "upset that he has not gotten his medication in 2 days."

32.     None of the defendants took steps to ensure that Mr. Goodwin had access to his prescription medication that he was taking prior to being booked into the Kewaunee County Jail or to ensure that Mr. Goodwin received the immediate medical attention that he needed while he was in jail.

33.     After having been denied his prescription medications, Divalproex and Lamotrigine, on multiple occasions over four days, Mr. Goodwin suffered a seizure in the Kewaunee County Jail on September 3, 2022.

34.     Nurse Bosdeck responded to the location where Mr. Goodwin was having an active seizure. Instead of calling 911 to get Mr. Goodwin to the hospital, Bosdeck called Defendant Torres. Defendant Torres instructed nurse Bosdeck to get Mr. Goodwin to the hospital.

35.     On September 3, 2022, one of the nurses from Aurora Hospital Emergency Department noted, "Patient reported missed Depakote and Lamictal doses. Per report from the jail nurse, patient missed medications for the last 4 days."

36.     Kewaunee County took Mr. Goodwin into legal and physical custody, thereby establishing a special custodial and supervisory relationship between him and Kewaunee County and the individually named defendants to provide necessary medical care. This special custodial and supervisory relationship consequently gave rise to affirmative contractual legal duties by Kewaunee County and its employees, agents, and contractors to secure Mr. Goodwin's liberty interests, and rights, including his physical safety; essential medical care and treatment; and his right to be free from unnecessary pain and suffering, which are substantive rights protected by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution—rights which Kewaunee County violated.

37.     The Jail did not employ a nurse or other medical staff on a daily basis and instead left it up to non-medical jail staff to provide medical "care" for Mr. Goodwin most days.

38.     Defendants ACH and USA Medical failed to adequately train their employees to provide necessary prescription medication to individuals with serious medical conditions, such as epilepsy, who need to continue taking their prescription medication to avoid catastrophic or potentially deadly medical events.

39.     Defendants ACH and USA Medical failed to have a sufficient policy or protocol in place to protect inmates who need to continue taking their prescription medication to avoid a catastrophic or potentially deadly medical event.

40.     Defendants ACH and USA Medical failed to employ adequate medical staff at the jail and failed to adequately train its correctional staff to distribute prescription medication as ordered by the Kewaunee County Jail doctor.

41.     Mr. Goodwin's serious medical needs were ignored because of the policies and practices of ACH, USA Medical, and Kewaunee County, pursuant to which the serious medical needs of people detained at the Kewaunee County Jail were routinely ignored.

42.     The foregoing events are the result of the defendants' policies and practices, which prioritize low costs for jailers and profits for ACH and USA Medical at the expense of the health and lives of people who are detained in jails serviced by ACH and USA Medical, including Kewaunee County inmates.

**ACH'S PRACTICE OF DENYING NECESSARY MEDICATION TO INMATES**

43.     ACH's deficient healthcare practices have injured incarcerated individuals throughout the country before and during the time period relevant to this lawsuit:

44.     *Danny Ray Burden*. When Danny Ray Burden was arrested in 2013, he informed ACH medical staff in Grant County Jail in Kentucky that he was diabetic and needed insulin injections. Medical staff failed to treat him with insulin, and he was sent back to the booking bench. As his booking continued, Mr. Burden began exhibiting extreme signs of the effects of low blood sugar. After much delay, emergency services were called. ACH staff failed to provide Burden with appropriate care while they waited for emergency services. When emergency services did finally arrive, Burden was in asystole rhythm. He eventually died at a hospital five days later on April 4, 2013.

45.     ACH received notice of complaints that Mr. Burden had received inadequate medical care when it was served with a lawsuit captioned Burden v. Grant County Fiscal Court, 14-cv-54 (E.D. Ky.) (2014). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Mr. Burden was the result of deficiencies in ACH's practices or practices regarding the delivery of medical care.

46.     *Whitney Foster*.  When Whitney Foster was arrested in 2014, she had been receiving treatment at a methadone clinic. Staff at the Madison County Jail in Alabama had noted in her records that she was taking methadone, but the ACH staff did not take the time to reach out to the clinic about her treatment status. During her detention, Whitney started exhibiting extreme signs of withdrawal. Despite these serious symptoms, ACH staff provided her only limited treatment and didn't refer her out to outside care. By the time Whitney was sent to offsite care, she had become blind and partially paralyzed due to multiple minor strokes and seizures. She was diagnosed with an irreversible case of Posterior Reversible Encephalopathy Syndrome.

47.     ACH received notice of the complaints that Foster had received inadequate medical care when it was served with a lawsuit captioned Foster v. Advanced Correctional Healthcare, Inc., 16-cv-521 (N.D. Ala.) (2016). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate

medical care. Yet ACH supervisors took no steps to determine whether the care provided to Foster was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

48.    *Gina Lenora White*.    When Gina Lenora White was incarcerated in a Tennessee jail in 2014, she had had a history of mental health issues, high blood pressure, and hypertension. She was initially transferred to the hospital for mental health evaluations and was then discharged to Henderson County Criminal Justice Center in Tennessee with a list from the hospital of medications she needed to take. For five days, Henderson County and the ACH staff employed there did not provide White with any of her required medication.  Around February 1, 2015, she began exhibiting symptoms due to her lack of medication and treatment: excessive sweating, hallucinations, inability to sleep, and tremors, among others.  On February 7, White was found dead in her cell, covered in her own excrement and bodily fluids.

49.    ACH received notice of the complaints that White had received inadequate medical care when it was served with a lawsuit captioned White v. Henderson County, 16-cv1020 (W.D. Tenn.) (2016).  ACH later settled the lawsuit.  ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care.  Yet ACH supervisors took no steps to determine whether the care provided to White was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

50.    *Heidi Williams*.  When Heidi Williams was arrested in October 2017, she had rheumatoid arthritis that was in remission. Her doctor had instructed her to stay on an

aggressive treatment and medication regimen to remain in remission. During booking she told staff at the Racine County Jail in Wisconsin about her disease and that she had her medication in her purse. But she did not receive her medication. As a result, later in the evening, she began to experience an attack of palindromic rheumatism. Despite other inmates attempting to gain the medical staff's attention to treat her, she received no medical care and was forced to continue to finish her booking. She was released a few hours later when her husband posted her bond. As they were leaving the jail, she collapsed and was not given any medical assistance by the jail. She sustained permanent damage as a result.

51.    ACH received notice of the complaints that Williams had received inadequate medical care when it was served with a lawsuit captioned Williams v. Racine County, 18-cv-1020 (E.D. Wis.) (2018). ACH later settled the lawsuit. ACH advertised for years that it analyzes the medical care at issue in lawsuits filed against it, and that it only settles lawsuits in which it concludes that its employees provided inadequate medical care. Yet ACH supervisors took no steps to determine whether the care provided to Williams was the result of deficiencies in ACH's practices or processes regarding the delivery of medical care.

## ADDITIONAL FACTS CONCERNING ACH PRACTICES

52.    ACH is a private for-profit contract medical care provider in jails throughout the United States.

53.    ACH advertises on its website that it "is the nation's largest jail contract management company, managing contracts for health care teams and customized programs in a variety of correctional settings" and that it operates in "over 370" locations in "21 states."

54.     ACH markets itself to jails based on its cost-cutting model, which includes contracting with the jails to have minimal medical staff present at the jail and training ACH employees and correctional officers to provide inmates with only "the minimum level of medical care required by the Constitution." ACH achieves this by, among other ways, cutting medical costs by refusing to send inmates to the hospital or outside medical providers and cutting pharmaceutical costs by denying inmates medication prescribed by outside medical providers.

55.     ACH expands its business and increases its revenue by underbidding its competition to win contracts to provide healthcare inside jails and then implements severe cost control measures to make a profit. This is done by denying and delaying medical care resulting in unnecessary suffering and deaths of people detained in the jails.

56.     When ACH representatives make their sales pitch to jails and counties for the healthcare contracts for the jails, they explain that they can deliver significant savings in managing the healthcare costs for the jail because their medical staff is "correctional trained" to deliver a lower standard of healthcare than what most people are used to getting from a "community healthcare" provider outside of the jail.

57.     The ACH Director of Marketing and Sales for example, has explained to potential customers during a sales pitch to a jail and county that ACH can achieve substantial savings by helping the jail "control your pharmaceuticals" by having the ACH doctors deny prescription medications that people in the jail were currently taking, including psychotropic medication because their jail had "a lot of inappropriate high dollar pharmaceuticals in their facility." The marketing and sales director went on to explain that

she did not mean to insult the jail's current doctor, and that he was probably a good doctor for people outside of jail. "But the correctional environment is different."

58.     The ACH CEO for example, has explained to potential customers during a sales pitch to a jail and county that the county could save a lot of money if they contracted with ACH. During that presentation, the CEO was asked how ACH could provide healthcare services at a lower cost than the county. The ACH CEO responded, "The way it saves money is [ACH does] absolutely everything that is necessary for the care of the inmates. [ACH doesn't] do absolutely everything the inmates want and when you start operating that way, the costs come way, way down."

59.     The CEO of ACH specifically trains ACH employees and correctional officers to cut costs and deliver minimal healthcare with the number one stated objective of the training being to teach ACH employees to "distinguish correctional from community healthcare." The training teaches ACH employees and jail staff to ignore or discount the medical concerns identified by persons in jails as things a person "wants" rather than legitimate medical needs, and it emphasizes that "inmates seek excellent medical care" in jails, but "[j]ails are not health spas, but places where people are incarcerated" and "you must give them everything they need, not anything they want," thus encouraging ACH employees and jail staff to ignore many medical concerns raised by the detainees housed there. The ACH training explicitly instructs ACH employees to only provide "the minimum level of medical care required by the Constitution." Trainings of this sort are repeatedly provided to ACH employees and correctional staff at facilities serviced by ACH.

60.     The ACH sales pitches to jails and counties further explain that they structure the ACH contract with the jail to financially incentivize both ACH and the jail to reduce costs associated with prescription medication and costs associated with sending inmates for medical treatment outside the jail.

61.     This mutual financial incentive to keep pharmaceutical and outside healthcare costs down is often set up in the contract with an annual "liability cap" that is a specified dollar amount to cover expenses like pharmaceuticals and outside healthcare costs. ACH agrees to pay for expenses like pharmaceuticals and outside healthcare costs up to the "liability cap" amount and if those annual expenses stay below the "liability cap" ACH keeps the unused portion of the liability cap as additional profit. But if the annual expenses for things like pharmaceuticals and outside healthcare exceed the "liability cap" then the jail or the county has to pay for all the expenses above the "liability cap." This contractual agreement provides a financial incentive to the jail to not pressure ACH to provide better healthcare at the jail, resulting in lower costs to the jail and more profit to ACH.

62.     The ACH CEO, for example, has explained to potential customers that the liability caps are rarely reached. And that exceeding the cap would not benefit either ACH or the jail, saying they "cannot let [expenses] go over [liability limit], because if it does, [ACH is] not making money and [the county is] spending money and the only way we can keep this thing going is to keep [the county] very happy which [ACH has] been very good at."

63.     The ACH sales pitches attempt to convince the jail and county that they can save money by providing this lower standard of correctional healthcare and denying

individuals expensive prescription medication inside the jail without exposing the jail or county to significant risks or costs associated with being sued for engaging in this type of conduct.

64. The ACH CEO, for example, has explained to potential customers that "one of the first things" ACH does is "train the staff, not just the nurses but the correctional officers [on] how to not take any medical responsibility, because right now they are taking responsibility as they have to make a judgment call as to whether somebody goes to the doctor, et cetera."

65. The ACH CEO, for example, has explained to potential customers that "[ACH is] very cognizant of inmate lawsuits and the eighth amendment rights of inmates" and also said, "So [we] are very specific about how [we] do this."

66. The CEO of ACH specifically trains ACH employees and correctional officers to cut costs and trains them that they can refuse to follow the orders of outside doctors without getting into legal trouble if they get an ACH doctor to order or approve the refusal. Thus, before there is even an actual inmate making an actual medical request, ACH is already planning to deny medical treatment. The training specifically teaches ACH employees that if they get an ACH doctor to agree that a detainee does not "need" what the outside doctor ordered or prescribed, then they do not have to legally comply with the outside doctor's order because if the ACH doctor disagrees it is not deliberate indifference, it is an "independent medical evaluation" or "is merely a disagreement over a treatment decision" according to ACH's cost-savings-oriented policies. Trainings of this sort are repeatedly provided to ACH employees and correctional staff at facilities serviced by ACH.

67.     The CEO of ACH specifically trains ACH employees and correctional officers to cut costs and gives a specific example where a detainee in jail wanted "psychiatric medications his community psychiatrist had prescribed," but the ACH doctor denied the detainee two of these psychiatric medications. Then, the CEO further explained, the "[c]ommunity psychiatrist mailed the jail all 3 prescriptions with a letter demanding that they be continued." The ACH CEO explained that the jail can operate in this fashion without getting into legal trouble because "jail staff did not deny access to care," but rather "[t]he jail staff followed the [ACH] doctor's orders" and "[t]he Sheriff has no duty to give an inmate medications prescribed by an outside doctor who was no longer treating the inmate without first consulting the jail doctor." Trainings of this sort are repeatedly provided to ACH employees and correctional staff at facilities serviced by ACH.

68.     To further align the mutual financial interests of ACH and its jail customers, ACH indemnifies its jail customers, like Kewaunee County, through substantial insurance coverage, and as a result, ACH's jail customers, including Kewaunee County, are willing to hire companies like ACH with poor track records in providing appropriate medical care.

69.     The ACH contract with Kewaunee County requires ACH to purchase an insurance policy that includes insurance for the Sheriff and Kewaunee County for ACH's civil rights violations with minimum limits of $1,000,000 per occurrence and $3,000,000 annual aggregate.

70.     Despite the lawsuits from inmates who have been injured or have died because of ACH's cost-cutting practices, ACH makes so much money that they are able to

continue to pay out for both settlements and jury verdicts related to claims they provided constitutionally deficient healthcare without undermining their profitability.

71.     ACH's minimalist, low-cost approach to healthcare, which aims to provide the cheapest, most minimal response to inmates' medical needs, results in woefully deficient medical care, unnecessary pain, suffering, permanent injuries, and death.

72.     ACH is aware that its approach fails to provide adequate medical care to people in custody, resulting in treatable or manageable medical needs developing into serious, life-threatening conditions, and death of inmates. But the occasional pay-out for a properly exhausted and adequately litigated civil rights violation, to ACH, is just part of the cost of doing business.

73.     ACH is deliberately indifferent to the danger that its practices will result in substandard or even catastrophic medical care and continues to maintain its same low-cost minimalist approach because it is so profitable for the company to continue to do so.

## RELATIONSHIP BETWEEN ACH AND USA MEDICAL

74.     Defendant USA Medical & Psychological Staffing, S.C. ("USA Medical") is a Service Corporation. All shareholders, directors, and officers of USA Medical are employees or owners of ACH.

75.     ACH outsources or subcontracts the performance of services that require licensure to practice medicine on all its jail contracts to USA Medical.

76.     USA Medical has the same mailing address, suite number, and phone number as ACH.  The contact information for USA Medical is an ACH employee and USA Medical's email address is an ACH-domain email address, "businessreg@advancedch.com."

77.     Norman Johnson is or was the president and CEO of ACH.  He is or was also an incorporator, shareholder, and director of USA Medical.

78.     On information and belief, USA Medical's only client is ACH.

79.     USA Medical was incorporated in 2018 by ACH, its owners, and/or its directors.

80.     As a service corporation, USA Medical engages in the practice of medicine.

81.     USA Medical was incorporated at least in part to comply with laws requiring the owners of a corporation engaged in a licensed practice (such as medicine) to be licensed in that practice.

82.     ACH exercises control over the manner of means by which USA Medical and its employees and officers perform their medical duties.

83.     ACH exercises administrative supervision over USA Medical and its employees necessary to ensure the fulfillment of the obligations of ACH's contracts at the facilities it services, including Kewaunee County.

84.     USA Medical operates as a subcontractor to ACH or a subsidiary of ACH.

85.     USA Medical employed Bosdeck.

86.     ACH and/or Norman Johnson exercises complete domination over USA Medical's finances, policy, and business practices with respect to USA Medical's medical practice, such that USA Medical has no separate mind or existence from these persons.

87.     USA Medical, its owners, and its directors did not change the ACH policies and practices described in this complaint.

88.     ACH used its control over USA Medical to commit the wrongs alleged in this complaint.

89.     ACH's control over USA Medical caused the injuries alleged in this complaint.

90.     USA Medical operates under the policies and practices of ACH and USA Medical has adopted those policies and practices as USA Medical's own policies and practices.

## COUNT 1:
### 42 U.S.C. § 1983 Claim for Deprivation of Due Process by Deliberate Indifference
### (Against Iris Torres)

91.     Plaintiff realleges the above paragraphs.

92.     Mr. Goodwin, at all times relevant to this complaint, was a detainee.

93.     Defendant Torres was subjectively and objectively deliberately indifferent to Mr. Goodwin's serious medical condition of epilepsy.

94.     There was a strong likelihood that Mr. Goodwin would have a seizure without his anti-seizure medication.

95.     Defendant Torres knew of that strong likelihood or strongly suspected the likelihood existed.

96.     Defendant Torres was, given her knowledge or strong suspicions, objectively unreasonable and caused Mr. Goodwin's injuries.

97.     Had Defendant Torres not acted in a manner that was objectively unreasonable, Mr. Goodwin would not have suffered a seizure.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant Torres because she acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

**COUNT 2:**
**State Law Claim for Negligence**
**(Against Iris Torres, ACH and USA Medical)**

98.     Plaintiff realleges the above paragraphs.

99.     In the manner more fully described above, Defendants Torres, ACH, and USA Medical owed Mr. Goodwin a duty to exercise the degree of care, skill, and judgment that a reasonable nurse or physician would exercise under the same or similar conditions.

100.    Defendants Torres, ACH and USA Medical breached that duty by one or more of the following acts or omissions between August 31, 2022, and September 3, 2022:

a. Failing to review Mr. Goodwin's medical file;

b. Failing to respond to Mr. Goodwin's requests for his anti-seizure medication;

c. Knowing that Mr. Goodwin was suffering from epilepsy but failing to continue his anti-seizure prescriptions or provide any treatment;

d. Failing to follow the orders of an outside physician or acting in a manner that they knew would prevent other jail or medical staff from following the orders of an outside physician;

e. Understaffing the medical unit at the Kewaunee County Jail and allowing nurses to act outside of their license and make medical decisions without contacting an on-call physician;

f. Failing to implement proper policies and procedures to ensure continuity of medication for inmates who are suffering from serious medical conditions that require continued administration of prescription medication to prevent catastrophic or potentially deadly medical events; and

g. Being negligent in their assessment, medication management, treatment, and rendering of medical care to Mr. Goodwin.

101. Defendant ACH failed to adequately train and supervise Defendant Torres.

102. Defendant Torres was acting in the course and scope of her employment with ACH and USA Medical at the time she breached the duty of care she owed to Mr. Goodwin.

103. As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions, Mr. Goodwin has suffered, and/or will continue to suffer damages.

104. Defendant ACH and USA Medical are vicariously liable for the negligent acts and omissions of its employees, agents, and contractors pursuant to the doctrine of *respondeat superior*.

**COUNT 3:**
**42 U.S.C. § 1983 *Monell*[1] claim**
**(Against Defendant ACH and USA Medical)**

105. Plaintiff realleges the above paragraphs.

---

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

106.    Defendant ACH and USA Medical authorized, tolerated, ratified, permitted, or acquiesced in policies, practices, and customs, oral and written, pronounced, and *de facto*, including detainee medical decisions made irrespective of appropriate medical judgment, which were objectively unreasonable and exhibited substantial departure from accepted professional judgment, practices, and/or standards, and which were also deliberately indifferent to the safety and suffering of detainees with serious medical conditions, including Mr. Goodwin in violation of his rights protected by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. These policies, practices, and customs were the moving force which caused the deprivation of Plaintiff's constitutional rights.

107.    Defendant ACH and USA Medical failed to adequately train and supervise their employees and maintained practices or processes pursuant to which detainees like Mr. Goodwin with serious medical needs were routinely denied medical care and access to medication.

108.    Specifically, there exist policies and widespread practices within the facilities at which ACH and USA Medical is contracted to provide medical care, including the Kewaunee County Jail, pursuant to which detainees receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which (1) healthcare staff commonly disregard reports by patients of objectively serious medical needs; (2) healthcare staff refuse to provide adequate treatment to patients complaining of serious medical conditions or in need of medications; (3) healthcare staff fail to ensure continuity of care among medical and correctional staff; (4) employees prioritize profits and maintaining a

competitive edge as a low-cost vendor at the expense of constitutionally adequate care; and (5) inadequate levels of health care staffing are provided, including inadequately qualified staff.

109.    Defendant ACH and USA Medical allowed these policies and practices to flourish because ACH and USA Medical, which directs the provision of healthcare services at numerous jails including the Kewaunee County Jail, directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.

110.    Defendant ACH and USA Medical's policies, customs, practices, supervision of employees, or lack thereof was a direct cause or moving force that caused the deprivation of Plaintiff's constitutional rights.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands actual or compensatory damages against Defendant ACH and USA Medical, and because they acted maliciously, wantonly, or oppressively, punitive damages, plus the costs of this action, attorneys' fees, and such other and further relief that the Court deems just and equitable.

## JURY DEMAND

111.    Plaintiff hereby demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: 7 May 2024,

/s/ John H. Bradley
John H. Bradley
  Wisconsin Bar No. 1053124
R. Rick Resch
  Wisconsin Bar No. 1117722
James Odell
  Wisconsin Bar No. 1131587
STRANG BRADLEY, LLC
613 Williamson St., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
John@StrangBradley.com
Rick@StrangBradley.com
James@StrangBradley.com

Attorneys for Plaintiff